IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION



```
In re VESTA INSURANCE          )
GROUP, INC., SECURITIES        )      CIVIL ACTION NO.
LITIGATION                     )
                               )      98-AR-1407-S
                               )
                               )
```

**MEMORANDUM OPINION**

In this matter of alleged securities fraud the court now
considers plaintiffs' motion for class certification, pursuant to
Fed. R. Civ. P. 23, and for recognition of lead plaintiffs as class
representatives.  On September 23, 1999, the court heard oral
arguments.  For the reasons set forth below, the motion will be
granted.

**BACKGROUND**

Plaintiffs assert securities fraud claims against Vesta
Insurance Group ("Vesta"), certain of its officers and directors,
its auditor, and its controlling shareholder.  Plaintiffs allege
that defendants improperly inflated the market price of Vesta's
securities by causing Vesta to issue materially false financial
statements spanning a period of four years.

After retreating from its threat to toss a coin in order to

1

pick between equally qualified groups of would-be lead plaintiffs, this court designated Israel Berger ("Berger")[1], Richard Sullivan ("Sullivan"), The Pointers, Cleaners, and Caulkers Local 1 Pension Fund ("PCC"), and the Florida State Board of Administration ("FSBA") as "Lead Plaintiffs" pursuant to 15 U.S.C. § 78u-4(a)(3)(B). On March 15, 1999, plaintiffs submitted the current motion for class certification on behalf of the following class:

> All persons who acquired the publicly traded equity securities of Vesta Insurance Group, Inc., between June 2, 1995, and June 28, 1998, inclusive, (the "Class Period"). Excluded from the class are defendants, defendants' families, any entity in which a defendant has a controlling interest, and their legal representatives, heirs, successors, and assignees.

In addition, lead plaintiffs ask this court to appoint them as representatives of the class.

## DISCUSSION

### Requirements for Class Certification Under Rule 23

A party seeking class certification bears the burden of proof. *Heaven v. Trust Co. Bank*, 118 F.3d 735, 737 (11th Cir. 1997). To maintain this case as a class action plaintiffs must satisfy the four prerequisites of Rule 23(a) namely, numerosity, commonality, typicality and adequacy. In addition, the plaintiffs must satisfy

---

[1] Berger voluntarily withdrew as a Lead Plaintiff and a proposed Class Representative on June 29, 1999.

a least one of the provisions of Rule 23(b). The decision of whether to certify a class action is left to the discretion of the district court. *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir.1981)

Rule 23(a)

The parties have recognized what many courts and commentators have recognized, namely, that there is considerable overlap among the Rule 23(a) requirements, especially among "commonality," "typicality" and "adequacy."[2] Defendants have elected to discuss their arguments against class certification under the "adequacy" prong, and this court will do the same. Although the other 23(a) requirements are, for the most part, conceded by defendants, the court will nonetheless briefly discuss each in turn.

1. Numerosity

The numerosity requirement is met if the class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). "'Impracticable' does not mean 'impossible'; plaintiffs need only show that it would be extremely difficult or inconvenient

---

[2] The adequacy-of-representation requirement "tend[s] to merge" with the commonality and typicality criteria of Rule 23(a) *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 626 , 117 S.Ct. 2231, 2251 (1997).

3

to join all members of the class." *In re Domestic Air Transp.*, 137 F.R.D. 677, 698 (N.D.Ga 1991). Numerosity is "generally assumed to have been met in class action suits involving nationally traded securities." *Zeidman v. J. Ray McDermott & Co., Inc.*,651 F.2d 1030, 1039 (5th Cir. 1981). Here, although the exact number of class members is not known at this time, plaintiffs point out that Vesta's average weekly trading volume was over 345,000 shares during the proposed class period, and that the names of the class members would be readily available from Vesta's transfer agent. Based on this representation, the court is convinced that the numerosity requirement will be satisfied.

During oral argument on this issue, and in the brief in opposition to class certification, counsel for defendant Huffman argued that numerosity is in doubt. Counsel argued that numerosity is not demonstrated merely by stating a number of potential class members. Instead, numerosity can only be demonstrated by counting those who might have a reasonable possibility of proving an injury. Extensive discussion and documentary evidence was included with the brief purporting to demonstrate that many potential class members actually made a profit, etc.

The court can consider the merits of the case at this stage

4

only to the degree necessary to decide whether the requirements of Rule 23 have been met. Here, however, the court would have to look at the merits beyond that point, deciding in each individual case whether the potential class member had a likelihood of ultimately prevailing. This is an evaluation of the merits that the court cannot perform. At the class certification stage, when dealing with allegations of fraud in the sale of securities traded on the New York Stock Exchange, the court is satisfied that the numerosity requirement has been met.

2. Commonality

To satisfy the commonality requirement, plaintiffs must show that there are questions of fact or law common to the class. Fed. R. Civ. P. 23(a)(2). It is not necessary that all questions of law and fact be common. See Cox v. American Cast Iron Pipe Co., 784 F2d. 1546, 1557 (11th Cir. 1986).

With respect to common issues in this securities fraud action under Rule 10b-5, all the plaintiffs, in order to prevail, will need to prove that the Vesta defendants made material misrepresentations or omissions, with scienter, on which the plaintiffs justifiably relied, causing damages. The absent class members would have to prove these same elements if they were to pursue their claims individually. Thus, the court finds that there

5

are questions of fact or law common to the class, and that the
commonality requirement has been satisfied.

3. Typicality

To satisfy the typicality requirement, plaintiffs must show
that the claims or defenses of the representative parties are
typical of the claims or defenses of the class. Fed. R. Civ. P.
23(a)(3).  The Eleventh Circuit set forth the standard for judging
typicality in *Kornberg v. Carnival Cruise Lines*, where the court
held:

> [T]here there must be a nexus between the class
> representative's claims or defenses and the common
> questions of fact or law which unite the class.   A
> sufficient nexus is established if the claims or defenses
> of the class and the class representative arise from the
> same event or pattern or practice and are based on the
> same legal theory. Typicality, however, does not require
> identical claims or defenses.  A factual variation will
> not render a class representative's claim atypical unless
> the factual position of the representative markedly
> differs from that of other members of the class.

*Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th
Cir. 1984).

In the present matter, all plaintiffs' claims arise out of
defendants' alleged pattern and practice of misrepresenting or
omitting material facts relating to Vesta's true financial position
during the class period.  Further, the claims arise out of the
event of the dramatic drop in market value of Vesta's stock

6

allegedly caused by the revelation of Vesta's true financial position.   Plaintiffs' legal theory is that defendants violated Rule 10b-5 of the Exchange Act.   The court finds that a substantial nexus exists between the class member's claims and between defendants' defenses, and therefore there are common questions of fact and law that unite the class.   Consequently, the typicality requirement is satisfied.

   4. Adequacy

   To satisfy the adequacy of representation requirement, plaintiffs must show that they, as class representatives, will fairly and adequately look after the interests of the class. Fed. R. Civ. P. 23(a)(4).   This requirement involves a two-part inquiry: (1) whether plaintiffs possess interests that are antagonistic to the interests of other class members, and (2) whether the representative(s) can be expected adequately to pursue prosecution of the lawsuit. *Sosna v. Iowa*, 419 U.S. 393, 403, 95 S.Ct. 553, 559 (1975).[3]

   _____

   [3] The version of this two-part inquiry that the Eleventh Circuit has adopted is somewhat different in its second step. The Eleventh Circuit version, like the *Sosna* version, first requires an inquiry into whether plaintiffs possess interests that are antagonistic to the interests of other class members; but then in its second step, the Eleventh Circuit requires inquiry into whether "the proposed class' counsel possesses the qualifications and experience to conduct the litigation." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir.1987).   Here, this court has referred back to the earlier *Sosna* version of this test stated by the U.S. Supreme Court for two reasons.   To begin with, the Eleventh Circuit's test is easily met in this case.   There is no dispute

With respect to part one of this two-part inquiry, defendants argue that plaintiffs possess interests that are antagonistic to the interests of other class members.   Specifically, defendants argue that the class includes some who bought Vesta stock and then sold it, some who bought stock and held it; some who bought before the disclosure of irregularities, and some who bought after the disclosure, etc.   Defendants argue that each plaintiff will work against other plaintiffs and other class members and seek to increase its own recovery by demonstrating the maximum price inflation on the date that most beneficially corresponds to its own history of purchases and sales.

This court is aware of the line of cases, headed by *In re Seagate Technology II Securities Litigation*, 843 F.Supp. 1341 (N.D.Cal.1994), where this type of potential intra-class conflict was held to be an insurmountable obstacle to class certification. *See also, O'Neil v. Appel*, 165 F.R.D. 479, 494 (W.D. Mich. 1996)(favorably citing Seagate, finding that those cases declining to at least examine the issue of intra-class conflicts in

---

here as to the qualifications of counsel. The inquiry into adequacy of representation in this case would be very brief indeed if the court stopped there. Second, Congress demonstrated its intent, in passing the PSLRA in 1995, that plaintiffs have a greater degree of responsibility than they did before in securities fraud class actions, not merely leaving everything to counsel. Therefore, this court will look not only to the qualifications of counsel, but to the qualifications of the plaintiffs, as the *Sosna* test requires.

securities fraud class actions abdicate their responsibility to absent class members under Rule 23); *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 485 (W.D. Mich 1994). For the most part, however, courts have found this type of intra-class conflict to be speculative and to relate mainly to questions of damages as opposed to the core question of liability. *See, e.g., In re Miller Industries, Inc.*, 186 F.R.D. 680, 687 (N.D. Ga. 1999) (defendants' concerns are largely theoretical and may be later addressed by the creation of subclasses. The alleged intra-class conflicts are primarily with respect to damages issues.) *In re Gaming Lottery Securities Litigation*, 1999 WL 102755 at 7-8 (S.D.N.Y.1999) (common questions concerning misrepresentations, scienter and materiality more significant than questions of price inflation which relate primarily to damages); *see also Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 394-95 (D.N.J.1998); *Picard Chemical, Inc. Profit Sharing Plan v. Perrigo Co.*, 1996 WL 739170 at 6 (W.D.Mich.1996).

This court is in accord with the majority, agreeing with those courts who differ with the reasoning of *Seagate II*. This court agrees that there will always be theoretical intra-class conflicts of the type discussed above in any securities fraud class action. In an active market, not all stockholders will buy or sell on the

same day. This will always present theoretical conflicts among class members. If these potential conflicts were deemed sufficient to defeat certification, the overall interests of the class would not be served. The court believes that the overriding goal of the class, and of its representatives, will virtually always be to demonstrate the liability of the defendant. Accordingly, under prong one of the two-part inquiry discussed above, this court finds that the theoretical intra-class antagonisms are not so great that the proposed representatives will be unable adequately to represent the class, and certification will not be denied based on these potential conflicts.

With respect to part two of this two-part inquiry, defendants argue that plaintiffs, for a variety of reasons, will not adequately pursue prosecution of the lawsuit. The arguments in this regard against each proposed class representative, and against the proposed class representatives as a group, will be considered in turn.

A. FSBA

Defendants argue that FSBA will not adequately pursue prosecution for two reasons: (1) FSBA is subject to unique defenses that will consume its attention and detract from its ability to adequately represent absent class members; and (2) FSBA has

10

conflicting fiduciary obligations because it owns significant holdings in one of the defendants.

### 1) Unique Defenses

The existence of unique defenses is certainly relevant to the certification process, *see* 7A Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1764 (1986). Defendants cite *Ross v. Bank South* for the proposition that if unique defenses will become too much the focus of the litigation, then the interests of the absent class members will be compromised. *See Ross v. Bank South, N.A.*, 837 F.2d 980, 990-91 (11th cir. 1988), *superseded in part on other grounds*, 885 F.2d 723 (11th Cir. 1989).("The existence of even an arguable defense can vitiate the adequacy of representation if it will distract the named plaintiff's attention from the issues common to the class.")  The converse is true as well.  That is, if arguable unique defenses will not distract the named plaintiffs' attention, then the interests common to the class will not be compromised.  As the *Ross* court itself noted in the same opinion quoted above:

> Although the existence of an arguable defense can be taken into account by the district court, the court is not required to deny certification for such speculative reasons. Questions concerning class certification are left to the sound discretion of the trial court. . . . Accordingly, we will not reverse the district court's

11

decision certifying the class merely because the
defendants have raised a defense which can be termed
"arguable." Some showing must be made by defendants that
the district court misunderstood the potential
significance of the asserted defense.

Some inquiry into the merits is required here to understand
the potential significance of any unique defenses and the degree to
which any unique defenses available against FSBA may dominate the
litigation. This court will not consider the merits now in order
to evaluate the likelihood that plaintiffs will prevail overall.
It will, however, look to the merits enough to determine whether
unique defenses will dominate to the detriment of the absent class
members. The Eleventh Circuit has approved an examination of the
merits for this purpose.[4]

One alleged unique defense here is that FSBA did not rely on
any alleged material misrepresentations when it purchased Vesta
stock. Therefore, defendants argue, FSBA cannot benefit from the
presumption of transaction causation (reliance) available through
the fraud-on-the-market theory.

---

[4] "While it is true that a trial court may not properly reach the merits of a claim when
determining whether class certification is warranted, . . . this principle should not be
talismanically invoked to artificially limit a trial court's examination of the factors necessary to a
reasoned determination of whether a plaintiff has met [its] burden of establishing each of the
Rule 23 class action requirements . " *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir.
1984) (internal citations omitted).

Defendants lack-of-reliance argument has two parts. First, defendants argue that FSBA abdicated its decision-making responsibilities by leaving the decision to purchase Vesta stock to a computer program (The BARRA optimizer), or to an outside manager (Barnett Bank). In either case, defendants claim, FSBA did not participate in the purchase and thus could not have relied on the efficiency or integrity of the market.

Second, defendants argue, even if use of computer programs or outside managers may sometimes constitute reliance, it cannot do so specifically in this case because plaintiffs cannot make the claim that their program would have generated a different result even had the alleged "bad news" about Vesta been incorporated into the computer's data base. Defendants argue that if FSBA would have made the purchase even knowing the correct figures, then the defendants alleged misrepresentations cannot be said to have "caused" FSBA to make the purchase of stock, and FSBA cannot be said to have "relied" on the market. These two arguments will be considered in turn.

First, with respect to the alleged abdication of decision-making, defendants rely on *In re Caremark* for the proposition that "[a]n investor's reliance on the advice of a third party in making the decision to purchase stock is, to this Court, qualitatively

13

different from an investor's reliance on a third party to make the
decision to purchase the stock." *In re Caremark Int'l. Inc. Sec.
Litig.*, 1996 WL 351182 (N.D. Ill. June 24 1996) at 6 (emphasis
added). Defendants argue that *Caremark* applies here because FSBA
did not just rely on advice to make its decision to buy Vesta
stock, but abdicated all decision-making to third parties (or
computer programs). Defendants further rely on *Fry v. UAL Corp.*
for the proposition that "a certain minimal level of participation
by the plaintiff in the relevant stock transaction must be
demonstrated [before a proposed class representative can be
certified]." *Fry v. UAL Corp.*, 136 F.R.D. 626, 635 (N.D. Ill.
1991). Defendants argue that based on *Fry*, FSBA cannot be
certified because it can demonstrate no participation whatsoever in
the decision to purchase the Vesta stock.

Accepting, *arguendo*, that the *Caremark* and *Fry* propositions
are correct, the court does not believe that they apply in this
case. In *Caremark*, the court refused to certify one out of four of
the class representatives, Mr. Shenker, because it found that "the
evidence shows that Shenker's investment pool had the authority to
make the purchase of Caremark stock without his participation, not
that Shenker relied upon his investment pool's advice in making his

14

own decision to purchase the stock."    *In re Caremark*, 1996 WL
351182 at 6.    Here, in contrast, FSBA did not give permission to
purchase Vesta stock without its participation.    FSBA is a pension
fund with $100 billion to invest.    This court finds that FSBA's
decision to use a computer optimization program to guide its
investments was an arguably prudent decision, and equal to
"participation" in the decision to purchase Vesta stock.[5]
Moreover, FSBA has introduced evidence that its Equity Analytics
staff monitors the investments and conducts a quarterly review.
Thus, there was hands-on participation, further distinguishing the
FSBA situation from one of pure abdication.

In *Fry*, the court declined to certify Mr. Marra as a class
representative because it found that "Marra intimates that he was
not even aware that his funds had been invested in what was then
Allegis.    The cases do not support a finding that someone who
abdicated complete authority over his relevant financial affairs
can be found an adequate representative."    *Fry*, 136 F.R.D. at 636.
Conversely, in the present matter, no one is suggesting that FSBA
"was not even aware that [its] funds had been invested."    Perhaps

---

[5] Indeed, with a $100 billion portfolio, FSBA might be
accused of breaching its fiduciary duty by failing to use a
computer program, if instead it had spent substantial sums hiring
experts to research and select each individual investment.

15

there may be times when the managers of a $100 billion dollar fund would not be able to name each investment under management at a given time, but that would more be a function of the size of the fund, not an "abdicat[ion of] complete authority of [its] relevant financial affairs." Thus, this court finds that *Caremark* and *Fry* do not apply to the facts in this case, and that the alleged unique defense of "abdication of decision-making authority" will not so consume the attention of FSBA that it will be unable adequately to represent the absent class members.

Second, defendants argue that FSBA cannot claim that the Barra optimizer program would have rejected Vesta had it known the true figures. Consequently, defendants argue, FSBA cannot show that any alleged misstatements by defendants "caused" FSBA to buy Vesta stock. Defendants argue further that this lack of transaction causation will be a unique defense that will consume FSBA's attention to the detriment of the absent class members.

At first glance defendants appear to make a compelling argument demonstrating lack of causation. This court believes, however, that defendants' argument only tells part of the story. Here, Vesta's numbers were not only less favorable, but if plaintiffs' allegations are accepted as true, they were also fraudulent. That is the part of the picture that the Barra program

16

.

would never have known.

During oral argument on this issue, defendants put forth the following argument:

> There is no reason [FSBA] couldn't have gone back and put in the numbers, Vesta's restated numbers, and have the computer program come out and come up with an answer and told them, yes, we would have bought or, no, we wouldn't have bought.   If the answer is, yes, we would have bought, that would end the case.

This court disagrees.   Such a "buy" recommendation might indicate that FSBA should start looking for a different program.[6] But it would only "end the case" if, after incorporating Vesta's numbers, and the fact that they were fraudulent, the computer would then still have generated a "buy" recommendation.   That would end the case because it would show that the fraud did not cause the transaction.   The problem is that defendants fail to acknowledge that every purchase in an efficient market carries with it the presumption that the market price honestly reflects all material information.

To more clearly demonstrate the point, here is a second example offered by defendants during oral argument on this same issue:

---

[6] This is purely hypothetical; there is no intent here to disparage the Barra program.

17

Just to take a very clear example.  If there are two people dealing with each other face-to-face and one person made a false statement to the other to induce the victim to do certain things, if it could be shown that the victim would have done the same thing otherwise even had the truth been known, if the false statement had not been made, I submit that the fraud case fails.  The fraud has to cause the person to buy the stock or to undertake the transaction.

Here, the Barra program might have recommended a "buy" even including Vesta's "corrected" figures, but that does not mean that FSBA inevitably would have bought Vesta stock knowing "the truth." Knowing the corrected figures, FSBA would have known that Vesta was not as profitable a company as it would have been with the erroneous figures.  Notwithstanding that fact, FSBA might have had an investment strategy that included Vesta stock, for any number of legitimate reasons.   That investment strategy is none of defendants' business; it is none of the court's business.  If there is a problem with the strategy, that is something about which the Florida pensioners, if anyone, should be concerned.  Whatever the strategy, FSBA should have been able to presume that the market price for Vesta was based on honest and accurate financial information, and when it purchased Vesta, even if would have done so with the less favorable numbers, it was paying for that stock approximately what it was actually worth.

The court is aware that the U.S. Supreme Court in *Basic v.*

*Levinson*, 485 U.S. 224, 108 S.Ct. 978 (1988) held that the presumption of reliance afforded to buyers and sellers of stock by the fraud on the market theory is not conclusive.   It is rebuttable.   Again, however, the Supreme Court made clear that it is not the knowledge of the corrected numbers alone that defeats the presumption of reliance, it is the knowledge that the numbers are <u>fraudulent</u> that defeats the presumption.   The Court held:

> Any showing that severs the link between the alleged
> misrepresentation and either the price received (or paid)
> by the plaintiff, or his decision to trade at a fair
> market price, will be sufficient to rebut the presumption
> of reliance. For example, if petitioners could show that
> the "market makers" were privy to the truth about the
> merger discussions here with Combustion, and thus that
> the market price would not have been affected by their
> misrepresentations, the causal connection could be
> broken:  the basis for finding that the fraud had been
> transmitted through market price would be gone.

*Id*. at 248, 108 S.Ct. at 993.

Here, if the Barra program would have generated a "buy" even with the corrected figures, that fact might indicate an investment strategy with which others could disagree.   It would not, however, indicate that "the basis for finding that the fraud had been transmitted through market price would be gone."   It would not indicate that FSBA was "privy to the truth" that the numbers were fraudulent.   As the *Basic* Court succinctly stated: "An  investor

19

who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." *Id.* at 247, 108 S.Ct. at 991.

Accordingly, while examining the merits of this matter only as necessary at this stage, the court finds that the alleged unique defense of lack of transaction causation will not so consume the attention of FSBA that the interests of the absent class members will be compromised.

> 2) <u>Conflict between FSBA's duties to its pensioners and to the class</u>.

Defendants next argue that FSBA will not adequately pursue the claims on behalf of the unnamed members of the class because, as an owner of a significant investment in Torchmark, one of the defendants, FSBA will be pulled in two directions to the detriment of the class. If FSBA seeks maximum damages against Torchmark on behalf of the class, defendants argue, FSBA will breach its fiduciary duty to its pensioners to whom it owes a duty to maximize the value of the pension fund's holdings. For the reasons discussed below, the court finds that this conflict will not disqualify FSBA.

To begin with, the court detects nothing to indicate that this hypothetical conflict has actually caused FSBA to pull any punches

20

in this case. FSBA's general counsel has testified that FSBA would vigorously prosecute claims against Torchmark, and FSBA has, in fact, named Torchmark as a defendant and set forth extensive allegations of wrongdoing in the complaint. FSBA's total equity position in Torchmark amounts to $15 million, a very small fraction of its $100 billion portfolio. Furthermore, there are two other lead plaintiffs here who will have no reluctance to seek maximum damages from Torchmark.

More significant, from this court's perspective is the unequivocal policy position expressed by Congress when it passed the Private Securities Litigation Reform Act (PSLRA) in 1995,[7] demonstrating its intent that large institutional investors should be encouraged to serve as class representatives in securities fraud class actions. There can be no doubt that Congress understood that large institutional investors with multi-billion dollar portfolios would likely always hold equity investments in a broad spectrum of companies, some of which would likely be defendants in securities cases. As the legislative history of the PSLRA demonstrates, Congress found that "[i]nstitutional investors are America's largest shareholders, with about $9.5 trillion in assets,

---

[7] 15 U.S.C. § 78u-4

21

accounting for fifty-one percent of the equity market."[8]  Even if
these equity investments are not held in named defendants, in this
economy with intertwined business relationships of every kind, it
is easy to foresee that a large damage award against one entity
might negatively impact an equity position with another.  If this
condition were enough to defeat certification as a class
representative, large institutional investors would almost
invariably be disqualified; precisely the opposite of what Congress
intended in passing PSLRA.

As the SEC has recently observed:

> [T]he standards for an adequacy challenge must be viewed
> in the context of the lead plaintiff provisions as a
> whole. . . . The largest financial interest requirement
> was itself designed to ensure more effective
> representation of investors in securities fraud class
> actions.  Congress sought to encourage large investors,
> including institutions, to serve as lead plaintiffs, and
> believed that institutions could and would qualify as
> lead plaintiffs.  The Commission believes that the
> standards for an adequacy challenge must not be read and
> applied in such a manner that they would nullify the
> largest financial interest requirement and defeat the
> purposes of the lead plaintiff provisions. . . . Thus,
> courts have recognized that generic arguments that would
> systematically disqualify large investors and
> institutions from serving as lead plaintiff should not
> suffice as "proof" [of inadequacy] under the statute.

---

[8] See H.R. Rep. No. 104-369, at 34 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 733
(joint explanatory Statement of the Committee of Conference, Statement of Managers--The
Private Securities Litigation Reform Act of 1995).

*The SEC Speaks in 1999: Office of The General Counsel Recent Judicial Developments*, 1104 PLI/Corp 291, 484-85 (1999) (internal citations omitted).

This court finds that defendants' argument here, that FSBA should be disqualified because of the conflict between the members of the class and its pension beneficiaries, could be an argument against certifying almost all institutional-investors. This argument amounts to a "generic argument that would systematically disqualify large investors and institutions from serving as lead plaintiff." *Id.* While there may be the occasional extreme case where a conflict of this type is too great and simply dominates the landscape too completely to ignore,[9] in light of the policy behind that PSLRA, disqualification on this basis should be the exception rather than the rule. Accordingly, the court finds that FSBA, having taken all steps toward vigorously pursuing the claims against Vesta and Torchmark, is adequately representing the interests of the absent class members. Any speculation regarding potential conflicts of interest will not defeat FSBA's certification as a class representative.

---

[9] *See In re Cendant Corp. Litig.*, 182 F.R.D. 144, 149 (D.N.J. 1998) ("[T]he Public Pension Fund Investors hold combined investments in Merrill Lynch in excess of $300,000,000--a figure several times greater than the $6,400,000 they allege to have lost . . .and could not be expected to pursue vigorously recovery from that defendant. . . . Though they publicly (and theatrically) pledged to the Court and gallery to pursue any and all viable claims against Merrill Lynch, logic and simple mathematics speak louder.")

B. <u>PCC</u>

Defendants raise several arguments against the adequacy of PCC as a class representative. These include 1) PCC is subject to the unique defense of lack of transaction causation 2) PCC had no involvement in the decision to invest in Vesta 3) PCC has a disabling conflict between its own pensioners and the absent class members 4) PCC lacks knowledge about the case and would give complete control to its lawyers. Each will be considered.

First, defendants argue that PCC is subject to the unique defense of lack of transaction causation because its portfolio manager cannot say whether or not PCC would have purchased Vesta had it known of Vesta's "corrected" figures. This is the same argument discussed with respect to FSBA, and the same analysis applies. Assuming that the running of the "corrected" numbers would have generated a "buy" recommendation, PCC and its portfolio manager should still have been able to presume that the purchase price was free of fraud and reflected all material information. Thus, as with FSBA, the court finds that PCC will not be so distracted defending against allegations of lack of causation that it will be unable adequately to represent the class.

Second, defendants argue that PCC had no involvement in the decision to invest in Vesta because the Vesta shares were purchased

24

through a discretionary account managed by one of PCC's outside portfolio managers. Again, the court believes that reliance on portfolio managers, computer programs, or other devices is entirely reasonable and appropriate. It can be argued that a computer's reliance or a manager's reliance is the ultimate purchaser's reliance. Use of such assistance does not indicate an abdication of responsibility, nor does it indicate any lesser degree of reliance on the integrity of the market.

Third, defendants argue that PCC has a disabling conflict between its own pensioners and the absent class members. As discussed above with FSBA, this court believes that institutional investors representing a class will almost always have similar potential conflicts. The court sees no indication that PCC has failed to vigorously pursue all claims, and any hypothetical conflicts will not disqualify PCC as a class representative.

Finally, defendants argue that PCC lacks knowledge about the case and would give complete control to the lawyers and therefore cannot represent the class. This court disagrees, and finds persuasive the comments of the court in *In re Miller Industries, Inc.*, 186 F.R.D. 680 (N.D. Ga. 1999):

Defendants argue that the lead Plaintiffs are inadequate class representatives because they are unfamiliar with

25

the allegations of the Amended Complaint and are
unfamiliar with, unwilling to or unable to discharge
their obligations as class representatives. . . . The
basic flaw of the Defendants' analysis is that the
alleged deficiencies . . . are irrelevant in a fraud on
the market case such as this which is prosecuted by able
and experienced counsel. . . . The fact that they are
allowing their counsel to prosecute the case demonstrates
the exercise of good judgment and not abdication of their
obligations as class representatives.

*Id.* at 687-88.

The court in *Morris v. Transouth Financial Corp.*, 175 F.R.D.

694 (M.D. Ala 1997) made a similar observation:

The defendants contend that the plaintiffs have little
knowledge of the case and that they have abdicated all of
their responsibility as class representatives to their
counsel.   The evidence before the court demonstrates
that the plaintiffs have been active participants in this
litigation.   They have hired counsel, they have been
deposed, and they have a basic understanding about the
nature of this lawsuit.  They also testified they believe
that the defendants did something wrong. . . . [I]n a
complex case such as this one, the plaintiff need not be
intimately familiar with every factual and legal aspect
of the case.  He may rely on counsel to investigate and
litigate the case and his reliance does not make him an
inadequate representative.

*Id.* at 698.

Here, PCC has hired counsel, been deposed, and testified that:

we bought stock through our brokers and consultants on
misleading information. . . . I'm saying that during the
class period your client and the other clients sitting
around the . . . table participated in such actions that
caused this stock to be sold to people who relied on the
marketplace correct information and the information was
not correct. . . [T]he facts are that the general public

was misled.

The court is aware that one of the policies of the recently enacted PSLRA is to increase supervision of counsel by plaintiffs in securities fraud class actions. Increased supervision, however, does not require that plaintiffs take over the duties and responsibilities of counsel. It is worth noting that both the cases quoted above are post-PSLRA cases. This court cannot expect the degree of involvement and expertise on the part of plaintiffs that defendants insist upon. As the Eleventh Circuit has held when discussing this issue, demanding such involvement and expertise could "prevent the vindication of the legal rights of the absent class members under the guise of protecting those rights." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 728 (11th Cir. 1987). The court finds that PCC will adequately pursue prosecution on behalf of the class.

### C. Richard Sullivan

Defendants argue that Richard Sullivan ("Sullivan") will not adequately pursue prosecution because (1) Sullivan is unfamiliar with the case; and (2) Sullivan is subject to the unique defense that he is a sophisticated investor.

First, the court finds that Sullivan is sufficiently familiar with the case and, for the same reasons discussed with respect to

27

PCC, that this level of knowledge is more than enough to allow him to function as a class representative. Sullivan hired counsel, has been deposed, and demonstrated during his deposition that he clearly understood that this case was based on allegations of securities fraud. Sullivan testified that he would spend "whatever time it takes" to fulfil his role as a class representative, which he described in this way: "My role is to assure that the litigation as it goes forward protects the class, if the class is certified, and to keep my attorneys in line, as any client should." He further testified that he saw his role as trying to "maximize the recovery" for the class. The court finds that Sullivan's familiarity with the case is sufficient to adequately represent the class.

Next, defendants argue that Sullivan will be subject to unique defenses because he is a sophisticated investor. Defendants argue that Sullivan's investment strategy includes toleration of a higher degree of risk than the average investor. Furthermore, defendants claim that Sullivan's practice of selling covered call options renders his claim atypical. Defendants argue that Sullivan will be distracted by the unique defenses applicable to him and that he will, therefore, be rendered unable adequately to represent the class.

The court finds that the creativity or sophistication of Sullivan's investment strategy is not controlling on the question whether he relied on the integrity of the market.  The Eleventh Circuit so held in *Kennedy v. Tallant*:

> [A]ppellants contend that Kennedy's claim against them is not typical of the class. . . . Kennedy is an experienced investor who admits never reading the PLC prospectuses and did not rely on them when purchasing PLC stock.  The other class members are investors of varied proficiency, many of whom read and relied on the prospectuses. According to appellants, this is a crucial distinction which renders Kennedy's claim atypical.  We disagree. . . . . Kennedy claimed and later proved that appellants committed the same unlawful acts in the same method against an entire class.  Thus, all members of this class have identical claims.   The degree of investment experience or sophistication of each of the class members is irrelevant.

*Kennedy v. Tallant*,   710 F.2d 711, 717 (11th Cir. 1983)(internal citations omitted).

The court finds that Sullivan will not be so distracted defending against allegations that he is a sophisticated investor that he will be unable to represent the class.

D. <u>Argument Against the Class Representatives as a Group: Lack of Decision-Making Structure or Plan.</u>

Defendants argue that whatever the qualifications of the individual proposed class representatives, this group of representatives cannot adequately pursue prosecution of this matter on behalf of the class because they have no decision-making

structure.  As evidence of this, defendants point out that a) none

of the plaintiffs know any of the others; b) the plaintiffs have

not communicated with each other; and c) none could explain how

they had come to become lead plaintiffs, or why each of the three

was needed.  Defendants argue that the lack of organizational

structure is fatal because without such a structure the putative

class  representatives  cannot  effectively  give  direction  to

counsel.[10]

Plaintiffs counter these arguments by pointing out that each

of  the  proposed  class  representatives  has  testified  that  it

individually is actively involved with the case and in regular

consultation with its respective attorney.  Each intends to be

active in decision-making and in monitoring its counsel.  The court

agrees with plaintiffs that neither Rule 23 nor the PSLRA requires

---

[10] The court is not convinced, as suggested by defendants in brief and oral argument on this issue, that *Switzenbaum v. Orbital Sciences Corp.*, 187 F.R.D. 246 (E.D. Va. 1999) speaks directly to the question at hand.  In *Switzenbaum,* the court was choosing between competing lead plaintiffs.  The criticisms the court made of one, lack of cohesion, etc., must be viewed in the context that the court had another lead plaintiff to its liking ready to go.  Here, we are through the lead plaintiff stage and this court has already determined once that this present group can be effective as lead plaintiffs.  The court agrees that it is free to reconsider that determination at this phase, but this reconsideration must be done with some deference to the previous determination. This is especially true in light of the fact that a reversal of direction now would not simply mean a choice between alternatives as in *Switzenbaum*, it would completely derail the case.  The court would not hesitate to do so if it were convinced that this was the proper course, which it is not. But the court is pointing out here that the different procedural position of *Switzenbaum* is not entirely irrelevant.

more, and that numerous class actions have been prosecuted where multiple lead plaintiffs have satisfactorily proceeded with a structure no more formal than the one here.

The court finds that the plaintiffs have met the requirements of Rule 23(a), and now considers whether plaintiffs cans satisfy the requirements of Rule 23(b)(3).

Pursuant to Rule 23(b)(3), the court considers (1) whether issues of law or fact common to members of the class predominate over questions affecting only individual members; and (2) whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed.R.Civ.P. 23(b)(3).

With respect to the first requirement, predominance, it is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions. *Cox*, 784 F.2d at 1557. Thus, issues in the class that are subject to generalized proof must predominate over those issues that are subject only to individualized proof. *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir.1997).

Here, plaintiffs have alleged a series of material

31

misrepresentations. Plaintiffs claim that to the extent they can prove that these statements were materially false and misleading, they will have proved the same for all class members. Plaintiffs claim that these alleged misrepresentations had the same effect on all class members, namely, that it caused them to purchase Vesta securities during the class period at artificially inflated market prices.

The claims of each member of the class arise out of this same set of operative facts. The legal questions common to each member of the class are whether the alleged misrepresentations constitute securities fraud. The facts alleged by plaintiffs are sufficient to satisfy the requirement that common questions of law and fact predominate over individual questions.

To certify a class under Rule 23(b)(3), the court must also find that class treatment is superior to other available methods of adjudication. Rule 23(b)(3) includes a nonexhaustive list of pertinent factors: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the

32

difficulties likely to be encountered in the management of a class action. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615, 117 S.Ct. 2231, 2246 (1997).

The court finds that a class certification is superior to any other method of adjudication and is the most practical way to proceed. First, the amounts at stake for individuals would in many cases be so small that separate suits would be impracticable. Next, there is no evidence that other class members have an interest in prosecuting their own lawsuits. Third, with respect to the desirability of the present forum, Vesta's principal place of business is within the Norther District of Alabama. Finally, the court sees no unusual difficulties likely to be encountered in the management of this case as a class action. If anything, securities fraud cases are considered particularly appropriate for treatment as class actions, because they involve "a single conspiracy and fraudulent scheme against a large number of individuals." *Kirkpatrick v. J.C. Bradford & Co.*,827 F.2d 718, 725 (11th Cir. 1987). Accordingly, plaintiffs have satisfied the requirements of Rule 23(b)(3).

## CONCLUSION

For the reasons stated above, plaintiff's motion for class

33

certification will be granted. Further, the court will recognize FSBA, PCC, and Richard Sullivan as class representatives. An appropriate order will be separately entered.

DONE this 25th day of October, 1999.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE