IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| IN RE VESTA INSURANCE GROUP,<br>INC. SECURITIES LITIGATION | ]<br>]<br>]<br>] | CV-98-BE-1407-S |

**MEMORANDUM OPINION**

This matter comes before the court on the Supplemental Motion to Decertify the Plaintiff Class (doc. 378) filed by the only remaining Defendant, Torchmark Corporation. For the reasons stated on the record at the hearing held July 3, 2008, and summarized below, Torchmark's motion will be GRANTED IN PART and DENIED IN PART. Specifically, the court will amend the class definition to terminate June 1, 1998 rather than June 28, 1998.

**I.  BACKGROUND**

In 1998, Vesta Insurance Group, Inc. made a series of disclosures concerning certain accounting irregularities and errors, which resulted in a restatement of Vesta's cumulative revenues and net income for the years 1995, 1996, and 1997. In the wake of these disclosures, Vesta's stock value decreased, and Plaintiffs filed a complaint against Vesta and certain of its officers and directors; KPMG Peat Marwick LLP, Vesta's independent auditor; and Torchmark, Vesta's largest stockholder. Plaintiffs alleged causes of action under Sections 10b and 20(a) of the Securities Exchange Act of 1934.

On October 25, 1999, after full briefing and hearing, District Judge William M. Acker, Jr. certified the following class:

> All persons who acquired the publicly traded equity securities of
> Vesta Insurance Group, Inc., between June 2, 1995, and June 28,

1998, inclusive, (the "Class Period").  Excluded from the class are
defendants, defendants' families, any entity in which a defendant
has a controlling interest, and their legal representatives, heirs,
successors, and assignees.

This case has taken many turns since that certification, most recently an interlocutory appeal to the Eleventh Circuit Court of Appeals.  During this time, all Defendants except Torchmark have settled with Plaintiffs.  Prior to the recent interlocutory appeal, Torchmark filed a motion to decertify or, in the alternative, to amend the class (doc. 342).  The court held the motion in abeyance pending the appeal.  Pursuant to this court's most recent post-appeal scheduling order (doc. 375), Torchmark filed a supplemental motion to decertify on April 15, 2008.

Torchmark's motion focuses on three of Vesta's disclosures in 1998.  First, on March 16, 1998, Vesta issued the following press release:

> [F]ollowing discussions with the Alabama Department of
> Insurance during its routine examination, [Vesta] agreed to make
> certain adjustments to its statutory results for the fiscal year ended
> December 31, 1997.  These adjustments result from a change in the
> technique of accounting for its reinsurance business on a statutory
> basis to more closely approximate cash basis accounting.  Vesta
> had been accounting for this business on an accrual basis for
> statutory reporting.  Vesta stated that the adjustments will have no
> impact on the Company's reported GAAP results for 1997 and that
> they are not expected to have a material impact on its 1998 results
> or its results in future years.

Plaintiffs refer to the erroneous use of this accounting methodology as the "Domestic Projections."  Two days after this press release, Credit Suisse First Boston Corporation ("CSFB"), a full services securities firm, indicated that Vesta's accounting revision was "expected to have minimal impact on the company's GAAP accounting."

On June 1, 1998, Vesta issued the second announcement:

> [Vesta] is conducting an internal investigation, undertaken at its
> own initiative, into possible accounting irregularities that are likely

> to affect its previously reported earnings for the first quarter of 1998 and the fourth quarter of 1997.  The Company indicated that, although the investigation is in its early stages, it has to date identified a net financial impact of these issues approximating $15.25 million affecting these quarters.  The investigation is also considering whether the irregularities affect any of the Company's other previously reported results.
>
> The Company also reported that it had received and accepted the resignation of Robert Y. Huffman, President and Chief Executive Officer of the Company and a member of its Board of Directors.

Plaintiffs refer to these accounting irregularities as the "Huffman Irregularities."  The press release also stated that Vesta "was confident that the results of the investigation would not impact the overall positive financial health of Vesta nor interfere with its business."  Nevertheless, the following day, Vesta's stock fell approximately 47%; this drop occurred on a trading volume more than 40 times the three-month daily average.  The New York Stock Exchange "halted" trading in Vesta's securities on June 1, 1998 – a development that, in Plaintiffs' words, "shocked financial market participants."

This lawsuit was commenced during a flurry of class actions on that same day – June 2, 1998 – all based upon the "Huffman Irregularities."  Business Wire reported on June 2, 1998 that A.M. Best had placed Vesta "under review" based both on the June 1 release and the Alabama Department of Insurance ("DOI") investigation (which concerned "Domestic Projections").  Similarly, Dow Jones News Service reported that Merrill Lynch downgraded Vesta to "neutral" and refused to "counsel purchases of the shares."  On June 8, 1998, a Standard and Poor director expressed "concern about the depth of this.  We're not sure this is the end of it."  According to Plaintiffs' expert in this case, "[f]ollowing the announcement on June 1, 1998, investors were faced with considerable uncertainty about the full implications of the accounting errors and irregularities."

During the investigation into the Huffman Irregularities referred to in the June 1 press release, KPMG changed its opinion that the Domestic Projections – Vesta's prior use of the accounting method referred to in the March 16 press release – complied with GAAP. On June 29, 1998, Vesta thus announced:

> Vesta has concluded its internal investigation into accounting irregularities and . . . its findings will result in an aggregate $13.6 million net after-tax reduction (previously estimated at $15.25 million) in previously reported net income for the first quarter ended March 31, 1998 and the fourth quarter ended December 31, 1997.
>
> The Company also announced that it will correct the method of accounting by which it recognizes earned premium income on a revision of the actuarial information on which anticipated reinsurance premiums and losses were calculated. These corrections will result in a restatement of historical financial statements consisting of a cumulative $49 million reduction in reported net after-tax earnings for the period between 1993 and 1997.

The day of this press release, Vesta's stock fell another 6.66%. On June 30, the stock fell an additional 14.5%. More lawsuits were filed, this time based on the Huffman Irregularities and the Domestic Projections methodology. All suits were consolidated in October 1998.

In its motion to decertify the class, Torchmark argues that each of the press releases put investors on notice that Vesta's practices were called into question, and, therefore, investors could not have reasonably relied on Vesta's alleged misrepresentations. In addition, Torchmark argues that the Huffman Irregularities and Domestic Projections arise out of separate factual circumstances and implicate different issues of proof and defenses. Accordingly, for both reasons, Torchmark argues, individual issues of reliance predominate the class.

Torchmark also argues that an entire group of traders – "in-and-out" traders – should be excluded from the class (or the class should be decertified entirely because of their presence)

4

because those traders are subject to unique "transaction causation" and "loss causation" defenses. In-and-out traders' satisfaction of the causation requirement, however, "is a single legal issue, not dependent on individual factual determinations, and proper determination of individual damages can be determined at trial through the use of expert witnesses." *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 544 (E.D. Va. 2006) (rejecting the same arguments and finding that including in-and-out traders "will not make class litigation unwieldy or inefficient"). Plaintiffs point out that Torchmark's arguments concerning in-and-out traders is relevant to damages, not certification. Indeed, they state, those concerns were reflected in the court-approved Plan of Allocation for the settlements with other Defendants in this action by weighting recovery in favor of class members who purchased Vesta securities prior to June 1, 1998 and sold their shares no earlier than June 30, 1998. The court agrees and will address that argument no further. Instead, the court will examine whether the class period should terminate at the time of any one of Vesta's disclosures prior to June 29, 2008.

## II. LEGAL FRAMEWORK

The first step in determining whether a class action is appropriate is to look to the requirements of Fed. R. Civ. P. 23(a): (1) numerosity – that the class is so numerous that joinder of all members is impracticable; (2) commonality – that questions of law or fact are common to the class; (3) typicality – that the claims or defenses of the representative parties are typical of those of the class; and (4) adequacy of representation – that the representative parties will fairly and adequately protect the interests of the class. If all four elements are present, then the court must determine if the case satisfies two additional requirements under Fed. R. Civ. P. 23(b)(3): (1) predominance – common questions must "predominate over any questions affecting only individual members;" and (2) superiority – class resolution must be "superior to other available

5

methods for the fair and efficient adjudication of the controversy."

Class members' reliance on the alleged misrepresentations in purchasing securities during the class period is an essential element to a securities fraud claim. *See In re Fannie Mae Sec*, 247 F.R.D. 32, 38 (D.D.C. 2008). For issues relating to reliance to "predominate" under Rule 23(b)(3), plaintiffs generally invoke the fraud-on-the-market presumption established by the U.S. Supreme Court in *Basic v. Levinson*, 485 U.S. 224 (1988). That presumption allows investors to prove reliance by presuming that the market price at which investors purchased was influenced by the misrepresentations at issue. "The influx of curative information into the market rebuts this presumption because the fraud underlying the complaint is disclosed." *Fannie Mae*, 247 F.R.D. at 38. Without the presumption, individual questions of reliance predominate over common questions. *Id.* (citing *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 42-43 (2d Cir. 2006). Accordingly, a class period should be closed when a curative disclosure makes it unreasonable for the market as a whole to continue to rely upon the alleged misrepresentations, and, thus, reliance becomes a question for each individual investor. *In re. Res. Am. Sec. Litig.*, 202 F.R.D. 177, 185 (E.D. Pa. 2001).

Once a court has certified a class, the court may always re-examine the propriety of certification and the class definition. A district court may alter or amend its certification order anytime before a decision on the merits. *Forehand v. Fla. State Hosp. at Chattahoochee*, 89 F.3d 1562, 1565 (11th Cir. 1996) (citing Fed. R. Civ. P. 23(c)(1)) (holding that district court did not abuse its discretion by decertifying class ten years after initial certification – although such a "tardy" decertification is unusual and "perhaps disfavored"); *see also Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 140 (3d Cir. 1998) ("Under Rule 23(c)(1), District Courts are required to reassess their class rulings as the case develops.").

### III.  DISCUSSION

In the current motion, Torchmark's primary focus is the effect of "new information obtained through the discovery process" on Rule 23(b)(3)'s predominance element.  As noted above, Torchmark's essential argument is that individual issues of reliance predominate after certain allegedly curative public diclosures.  Torchmark has given the court no reason to revisit Judge Acker's analysis of the Rule 23(a) factors.  This court, however, has the benefit of almost ten years of case law that Judge Acker did not have at his disposal regarding the effects of certain types of disclosures on Rule 23(b)'s predominance requirement.

Two cases decided in the last ten years are particularly instructive in ruling upon Torchmarks' motion: *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative and "ERISA" Litig.* (*In re Fannie Mae Sec. Litig.*), 247 F.R.D. 32 (D.D.C. 2008), and *In re Resource America Sec. Litig.*, 202 F.R.D. 177 (E.D. Pa. 2001).  In the former case, the Office of Federal Housing Enterprise Oversight ("OFHEO") commenced a special examination in response to accounting discrepancies at Fannie Mae in June 2003.  On September 22, 2004, OFHEO released an interim report concluding that Fannie Mae had misapplied certain GAAP principles; that Fannie Mae had inadequate internal controls; and that OFHEO no longer had confidence in certain members of Fannie Mae's management.  Fannie Mae's stock price dropped 5.51%.  Five days later, Fannie Mae announced that it had entered into an agreement with OFHEO to take steps to remedy the identified problems, and that it had formed a special committee of independent directors.

Between September 22 and September 30, 2004, the stock price dropped approximately 13%.  In mid-October 2004, Fannie Mae publicly disclosed that the U.S. Attorneys' Office was conducting a criminal investigation into the accounting irregularities, and, one week later, disclosed that the SEC had also initiated a formal investigation.  Fannie Mae continued to

maintain that its cooperation in all the investigations was not an admission of wrongdoing. On December 15, 2004, the SEC confirmed that Fannie Mae's practices did not comply with GAAP, and that Fannie Mae would restate its financial statements from 2001 through mid-2004. The stock price fell 1.97%. On December 21, 2004, Fannie Mae announced that it would restate its financials for 2001 through mid-2004; that it disavowed the accuracy of previous statements for that timeframe; and that it expected a restatement of approximately $9 billion. In its Form 8-K filed with the SEC, Fannie Mae stated that its previous statements should not be relied upon. Fannie Mae's stock price dropped 3.24%.

Throughout 2005, Fannie Mae's stock price continued to fall as additional information about its financial situation was publicly reported. Fannie Mae made additional disclosures and negative announcements in January, February, and April 2005. On September 27, 2005, a *Dow Jones* report identified additional accounting violations at Fannie Mae. The stock hit rock bottom the following day, having decreased an additional 40% since December 22, 2004. On February 22, 2006, Fannie Mae disclosed the results of its own investigation, which included identification of several accounting issues that were previously undisclosed. OFHEO released its final report three months later. On December 6, 2004, Fannie Mae finally restated its earnings, reducing them by $6.3 billion.

The plaintiffs requested that the class period run through September 27, 2005, the date they alleged the entire scope of the fraud was revealed to the market. Fannie Mae, on the other hand, requested the court to cut off the period at December 22, 2004. Plaintiffs argued in opposition to the December 22 cut-off that additional information regarding the extent of the alleged fraud continued to be released throughout 2005, and the full impact of the information was not absorbed by the market until September 27, 2005. The court disagreed. The court

8

examined whether "a substantial question of fact [existed] as to whether the release cured the market or was itself misleading." *Fannie Mae*, 247 F.R.D. at 39 (quoting *Friedlander v. Barnes*, 104 F.R.D. 417, 421 (S.D.N.Y. 1984)).  Even though additional information concerning other irregularities and the full extent of the fraud came to light after December 22, 2004, the court concluded that the December 22 announcement severed the link between the alleged misrepresentations and the stock price.  The court noted that "this is not a situation where the December twenty-second disclosure merely hinted at the existence of the problems and that the market barely reacted to a half-hearted disclosure."  *Id.*  Rather, on December 22, 2004, Fannie Mae explicitly warned investors to discount prior financial statements and that it anticipated a restatement of approximately $9 billion; thus, no "substantial question" existed as to whether investors were put on notice that the defendant's future was, "at best, uncertain." *Id.* at 40.  Of importance to the court's conclusion was the statistically significant market reaction of 3.24% after the December 22 announcement.  The court stated that the additional disclosures after December 22 did not render the December 22 announcement misleading or any less curative; thus the court terminated the class period on December 22, 2004.

      Another district court faced a similar situation in *In re Resource America Sec. Litig.*, 202 F.R.D. 177 (E.D. Pa. 2001).   On August 21, 1998, rumors circulated that the defendant Resource America, Inc. engaged in fraudulent accounting practices.  The stock price dropped 16.33%.  *Res. Am.*, 202 F.R.D. at 180.  On August 24, 1998, additional rumors surfaced, and a consultant published a report, referred to as the "Roberts Report," which stated that Resource America's accounting did not reflect the "true economics of business" or comply with GAAP.  The following day, Resource America's stock price dropped an additional 34.33%.  *Id.*  Following distribution of the Roberts Report, the stock price plummeted another 62% to $7.25.

9

The *Fannie Mae* plaintiffs requested a class period extending through February 22, 1999, the date that the first consolidated amended complaint was filed. Resource America requested the class period end when the market became aware of the misrepresentations – either August 21 or August 24, 1998. The court stated that "[t]he Roberts' Report, standing alone, might be sufficient to constitute curative information," but refused to end the class period on August 24 because Resource America made "aggressive public comments . . . aimed at countering the effect of the report." *Res. Am.*, 202 F.R.D. at 185. The court distinguished a number of cases in which courts had shortened proposed class periods on the basis that, in those cases, "the companies themselves" had issued curative disclosures, whereas Resource America had instead continued to deny the existence of any fraud. For example, the court noted that the defendant in *In re LTV Sec. Litig.*, 88 F.R.D. 134 (N.D. Tex. 1980), had announced its request to the SEC to suspend trading and issued a press release that possible adjustments could be made that would have a materially adverse impact on reported financial information. Such statements, the court noted, were "clear indication[s] to the market that there was something potentially wrong with the valuation of LTV stock." *Res. Am.*, 202 F.R.D. at 184. In contrast, Resource America continued to make optimistic and misleading statements to conceal the fraud; thus, the court extended the class period to the date of the consolidated amended complaint because Resource America continued its misleading statements, even after the initial complaint was filed.

Examining each of Vesta's releases, this court must determine whether "a substantial question of fact [existed] as to whether the release cured the market or was itself misleading." *See Fannie Mae*, 247 F.R.D. at 39. Plaintiffs' brief includes a number of arguments, with which the court agrees but will not repeat here, as to why, at the very least, a substantial question

10

continued to exist after the March 16 press release.[1]  The June 1 press release, on the other hand, requires closer examination.

The two cases described above establish that "publication of information in the press or issuance of press releases exposing allegations of misrepresentations serves to cut off the time period during which one could reasonably rely on the misrepresentations." *Res. Am.*, 202 F.R.D. at 184 (citing *In re ORFA Sec. Litig.*, 654 F. Supp. 1449 (D.N.J. 1987)).  Thus, the court must determine whether, on June 1, 1998, "sufficient corrective information entered the market, making reliance thereafter unreasonable as a matter of law, and thereby rebutting the fraud-on-the-market presumption," *Fannie Mae*, 247 F.R.D. at 38, or, "[a]t a minimum, the facts and legal issues . . . differ markedly from the relevant facts before" June 1, 1998,  *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 136 (D.N.J. 1984), making reliance after that date a question of fact as to each individual investor.

The circumstances surrounding Vesta's June 1 press release are similar to those presented in *Fannie Mae*.  Vesta announced that "possible accounting irregularities" were "likely to affect previously reported earnings" and that, "although the investigation [wa]s in its early stages, [Vesta had already] identified a net financial impact . . . approximating $15.25 million" affecting just two quarters.  Vesta indicated that it was investigating whether additional quarters were impacted and reported that its President and CEO resigned.

The market responded immediately and significantly.  Vesta's stock price fell almost 50%

---

[1] Torchmark, whose potential liability is based on the "control person" theory, raised in its reply brief, for the first time, that all events after March 16, 1998 were based on decisions made by KPMG, not Vesta.  Because Torchmark did not "control" KPMG, it maintains that it cannot be liable after March 16, 1998.  Torchmark did not properly raise this issue in its motion for decertification; consequently, the court will strike that portion of the reply brief that exceeded the scope of issues in Plaintiffs' response.  In any case, this argument is more relevant to Torchmark's liability than to the proper class period.

on a trading volume more than 40 times the average. Thus, the June 1 disclosure was not an ambiguous "hint" of problems to which the market "barely reacted." *See Fannie Mae*, 247 F.R.D. at 40 (noting that the market reacted with a *statistically significant* 3.24% drop in stock price); *see also In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 540 (E.D. Va. 2006) (finding that "sharp drop" in stock price indicated that the market had continued to rely on misrepresentations through prior disclosures and cutting off class period at time of sharp drop). Market analysts "downgraded" and refused to "counsel purchases" of Vesta's shares, and expressed "concern" about the scope of the fraud. The New York Stock Exchange even halted trading in Vesta's securities. Numerous lawsuits, including those from which this one grew, were filed on June 2, 1998, indicating the market's awareness of at least some of Vesta's alleged misrepresentations. *See Fannie Mae*, 247 F.R.D. at 40 (noting that the filing of numerous lawsuits after a specific disclosure suggested that most investors suspected significant fraud).

Vesta also did not engage in a continuous and repeated campaign of denial, optimism, or downplaying of the alleged misrepresentations to conceal them as in *Resource America*. The evidence before the court instead shows only that Vesta predicted, in the June 1 press release, that its "overall positive financial health" would not be impacted by its internal investigation. *Compare Res. Am.*, 202 F.R.D. at 185 (refusing to find that public report cured the market where the defendant *continued* to downplay the significance of the report); *Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 253 (D.N.J. 1992) (refusing to end class period where the CEO *continued* to depict the company as healthy, and the company denied the significance of negative reports); *In re Corel Corp. Inc. Sec. Litig.*, 206 F.R.D. 533, 544 (E.D.Pa. 2002) (finding that reliance was not unreasonable "in light of the *continued* and repeated optimism expressed by the Corel management team about the health of the company") (emphasis added). In all those cases,

12

the initial curative information came from a source other than the defendant itself, and the defendant subsequently made repeated statements denying or downplaying the significance of the publicly disclosed information. Here, on the other hand, the curative information came directly from Vesta *itself*, and, although Vesta indicated that its *overall* financial health should not be impacted, in the same breath it disclosed a *certain* forthcoming restatement of approximately $15 million and indicated that its investigation would look into the effect on additional quarters.

Vesta's "optimistic" statement did not overshadow the significance of its disclosures, as the market was not fooled and responded so substantially. In fact, at least one analyst expressly stated that he was concerned about the "depth" of the fraud after the June 1 press release. Plaintiffs' own expert stated that "[f]ollowing the announcement on June 1, 1998, investors were faced with considerable uncertainty about the full implications of the accounting errors and irregularities." Plaintiffs' new expert[2] "clarified" that the market had not priced in the *full* extent of the fraud after June 1, but only an *expectation* of the full extent. Plaintiffs cite to this "expectation" as evidence that the market was not cured, but this significant uncertainty is one of the very red flags that should have cautioned continued investment in Vesta's securities by all but the most adventurous investors.

That the market "expected" the wrong extent of fraud does not alter the information to which investors had access and the uncertainty that resulted from that information. In fact, the existence of a second significant drop in the price of Vesta's stock on June 29, 2008 does not alter the curative effect of the June 1 press release. *See Fannie Mae*, 247 F.R.D. at 35, 39 (finding disclosure curative even though the full extent of fraud was unknown until much later

---

[2] Plaintiffs' former damages expert, Professor Barclay, died in a plane accident in August 2007. Plaintiffs' new expert, Professor Jarrell, adopted Professor Barclay's report.

and stock subsequently fell more than 40% more).  In addition, the "expectation" of greater fraud than that already disclosed, as identified by Plaintiff's expert, undermines any reasonable reliance on earlier misrepresentations.  Therefore, individual questions of reliance predominate after June 1, 1998.  To show otherwise, Plaintiffs would have to prove that conduct after June 1, 1998 "continued to mislead the market and inflate the stock price."  *Fannie Mae*, 247 F.R.D. at 40-41 (citing *Data Access*, 103 F.R.D. at 144).  They failed to do so.

Thus, investors who purchased Vesta stock after June 1, 1998 stand in a different posture from those who purchased prior to that date; they cannot, as a matter of law, claim a reasonable reliance on Vesta's alleged misrepresentations under the fraud-on-the-market presumption.  Based on Vesta's June 1, 1998 press release, these investors were put on notice that Vesta's financial future was uncertain at best.  *See Fannie Mae*, 247 F.R.D. at 40; *see also Res. Am.*, 202 F.R.D. at 184 (distinguishing *In re LTV Sec. Litig.*, *supra*, in which the defendant's disclosures indicated that "something [was] potentially wrong"); *Alfa Life Ins. Co. v. Green*, 881 So. 2d 987, 992 (Ala. 2003) (recognizing, in case involving allegations of insurer's misrepresentations, that "[b]ecause it is the policy of the courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests. . . . If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and maxim applies, '*volunti non fit injuria*.'") (quoting *Torres v. State Farm Fire & Casualty Co.*, 438 So. 2d 757, 758-59 (Ala. 1983)).

Consequently, the court will amend the class definition to terminate the class period on June 1, 1998.  The amended class consists of

>All persons who acquired the publicly traded equity securities of Vesta Insurance Group, Inc., between June 2, 1995, and *June 1, 1998*, inclusive, (the "Class Period").  Excluded from the class are defendants, defendants' families, any entity in which a defendant has a controlling interest, and their legal representatives, heirs, successors, and assignees.

Amending the class at this juncture will *not* prejudice the rights of any current class member who is excluded from the class from this point forward.  "[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  *Griffin v. Singletary*, 17 F.3d 356, 360 (11th Cir. 1994) (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974)).  Accordingly, when a court decertifies a class, former class members can "go forward from the point where they had left off during pendency of the class action."  *Id.* at 360-61 (quoting *McDonald v. Sec. of Health & Human Serv.*, 834 F.2d 1085, 1092 (1st Cir. 1987)).

In light of this court's amendment of the class definition, counsel will effectuate the mailing of notice to affected class members by July 28, 2008.  Counsel shall submit a proposed notice for the court's approval prior to that date.  Class members who purchased Vesta securities both before *and* after June 1, 1998 shall be given the opportunity to opt-out of the class so that they may bring all of their claims together in an individual action if they so choose.  The notice will require any class member's opt-out notice to be postmarked by September 2, 2008.  The notice given to those class members who acquired Vesta securities *only* after June 1, 1998 need not include an opt-out option.  The statute of limitations will be tolled until September 2, 2008.

## IV.  CONCLUSION

For the reasons stated on the record at the hearing held July 3, 2008, and summarized above, the court concludes that the facts and issues "differ markedly" after June 1, 1998, and, as

a result, individual issues of reliance predominate over common ones. Accordingly, the court will amend the class definition to terminate the class period on June 1, 1998. The court will enter a separate order consistent with this memorandum opinion.

DATED this 22nd day of July, 2008.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE